IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| STORAGE CONCEPTS, INC., a Nebraska Corporation;<br><br>    Plaintiff,<br><br>  vs.<br><br>INCONTRO HOLDINGS, L.L.C., a Nebraska limited liability company; and CLOSETS UNLIMITED OF NEW JERSEY, INC., a New Jersey corporation;<br><br>    Defendants. | 8:20-CV-447<br><br>PRELIMINARY INJUNCTION ORDER |

This matter came before the Court on April 27, 2021 for hearing on Plaintiff's Motion for a Preliminary Injunction, Filing 25. Both parties appeared by counsel of record via video conferencing and submitted evidence. For the reasons stated below, Plaintiff's Motion for a Preliminary Injunction is granted.

## I. BACKGROUND

This case is a trademark dispute over use of the name "Storage Concepts." Filing 1. Plaintiff Storage Concepts, Inc. ("SCI"), is a Nebraska corporation that has operated in Omaha, NE and used the name Storage Concepts since 1981. Filing 27-1 at 1. SCI has provided residential storage services (custom closets, murphy beds, wine cellars, etc.) in the area continually since 1995. Filing 27-1 at 1; Filing 34 at 1. Edward Abersfeller is the founder and President of SCI. Filing 27-1 at 1. Rebecca and Matthew Maltby are employees of SCI. Filing 27-1 at 33, 35.

Defendant Incontro Holdings, L.L.C., opened a Closet & Storage Concepts franchise in Omaha in July 2019. Filing 33-4 at 3. Closet & Storage Concepts provides similar residential storage services to those provided by SCI, and the businesses compete for the same customers.

[Filing 32 at 35](#). Ken and Cindi Incontro are the owners and only members of Incontro Holdings. [Filing 33-4 at 2](#).

Defendant Closets Unlimited of New Jersey, Inc. is the franchisor of Closet & Storage Concepts and licenses locations throughout the country. [Filing 33-1](#). Closets Unlimited holds a federal trademark registration on the Closet & Storage Concepts service mark name, which notes a first use in commerce in 1998. [Filing 33-1 at 3](#); [Filing 33-2 at 2](#). Closets Unlimited also offers franchises in a storage solutions business called More Space Place; More Space Place and Closet & Storage Concepts franchises were intended to operate on different business models, however. [Filing 33-1 at 5](#). Bob Lewis is the founder and operator of Closets Unlimited. [Filing 33-1 at 2](#).

SCI provided evidence that soon after Closet & Storage Concepts opened in Omaha, SCI's owner and its employees observed instances of confusion among customers and others interacting with SCI. [Filing 27-1](#). These instances took the form of seemingly misdirected phone calls, questions and congratulatory remarks from customers and acquaintances mistaking Closet & Storage Concepts for a new SCI location, and stories of confusion between the Omaha businesses at the local Better Business Bureau. [Filing 27-1 at 2](#), 33-36. Believing Incontro Holdings was unfairly appropriating SCI's name, in December of 2019, Abersfeller registered the Storage Concepts trade name with Nebraska's Secretary of State on behalf of SCI and contacted Defendants to try to convince them to cease using the Closet & Storage Concepts name in Omaha. [Filing 27-1 at 2](#); [Filing 34](#). SCI's counsel subsequently sent demand letters to Incontro Holdings and Closets Unlimited with the same aim, including information that the Secretary of State had rejected registration of the name "Closets and Storage Concepts, Inc." because it conflicted with Storage Concepts and Storage Concepts, Inc. [Filing 27-1 at 3-4](#), 12-14, 21-22, 29-32. SCI rejected offers for the Omaha Closet & Storage Concepts to post disclaimers of affiliation while continuing

to use the name, and the parties' last formal communication was on April 17, 2020. On October 26, 2020, SCI initiated suit, including allegations of service mark and trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1125; misuse of a trade name under Nebraska law, Neb. Rev. Stat. § 87-216; and deceptive trade practices under Nebraska's Uniform Deceptive Trade Practices Act ("NUDTPA"), Neb. Rev. Stat. § 87-301 et seq.

## II. DISCUSSION

On January 11, 2021, SCI moved for the preliminary injunction now at issue. Filing 25. SCI argues Incontro Holdings use of the Closet & Storage Concepts mark in its Omaha residential storage business constitutes infringement of SCI's Storage Concepts mark and unfair competition, which will cause SCI irreparable harm if not enjoined. Filing 26. Defendants argue the marks at issue are not likely to cause consumer confusion, and SCI will therefore not prevail on the merits of its claims. Filing 32 at 25-41. Additionally, Defendants argue SCI has not made a sufficient showing of irreparable harm to warrant a preliminary injunction. Filing 32 at 20-25, 41-44.

In deciding a motion for a preliminary injunction, the court must consider "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). "A preliminary injunction is an extraordinary remedy . . . ." *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011) (citing *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)). The burden of establishing the propriety of issuing a preliminary injunction is on the movant. *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994).

### A. Threat of Irreparable Harm

SCI must show a threat of irreparable harm in the absence of an injunction in order to prevail. SCI must also explain its delay in seeking an injunction. The Court addresses each in turn.

1. *Irreparable Harm*

"[I]rreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016) (quoting *Gen Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009)). "Loss of intangible assets such as reputation and goodwill can constitute irreparable injury." *United Healthcare Ins. Co. v. Advance PCS*, 316 F.3d 737, 741 (8th Cir. 2002) (citing *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 625 (8th Cir. 1987)); *WWP, Inc. v. Wounded Warriors, Inc.*, 566 F. Supp. 2d 970, 978 (D. Neb. 2008) (same). Further, it is "simply not the law" that a plaintiff must prove "actual damage or injury" in a case of trademark infringement. *Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 403 n.11 (8th Cir. 1987).

"Injury is presumed once a likelihood of confusion has been established. All that the complaining party must do to establish its right to an injunction is to prove the likelihood of confusion." *Id.* (citations omitted); *see also Calvin Klein Cosmetics Corp. v. Lenox Lab'ys., Inc.*, 815 F.2d 500, 505 (8th Cir. 1987) ("The court correctly noted that it could presume irreparable injury from a finding of probable success in proving likelihood of confusion."); *General Mills, 824 F.2d at 625* ("Since a trademark represents intangible assets such as reputation and goodwill, a showing of irreparable injury can be satisfied if it appears that [a plaintiff] can demonstrate a likelihood of consumer confusion.") (citing *Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.*, 633 F.2d 746, 753 n.7 (8th Cir. 1980)).

As discussed in detail below, the Court finds SCI is likely to prevail on its Lanham Act and state law claims, having demonstrated a likelihood of consumer confusion. Because SCI demonstrates a likelihood of consumer confusion, the Court may presume irreparable harm.

*2. Delay*

"[D]elay alone may justify the denial of a preliminary injunction when the delay is inexplainable in light of a plaintiff's knowledge of the conduct of the defendant." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 894 (8th Cir. 2013) (citing *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995)). The parties dispute whether SCI's delay in seeking an injunction overcomes the presumption of irreparable harm. *Compare* Filing 32 at 22 ("SCI's delay in seeking to enjoin the alleged infringement stands in the way of its request for an injunction."), *with* Filing 37 at 18 ("Courts have considered delays to be excused for numerous reasons based on the circumstances of the case."). The Court agrees with SCI that any delay in seeking injunctive relief was explainable and legally excusable, and thus SCI has demonstrated irreparable harm.

The record indicates that an SCI employee knew of Closet & Storage Concepts' Omaha franchise "around the end of the Summer of 2019." *See* Filing 27-1 at 34 (Maltby noting her suggestion to an SCI caller that she was likely calling for the franchise). SCI's President, Edward Abersfeller, learned of Closet & Storage Concepts in Omaha in the fall of 2019. *See* Filing 27-1 at 1-2. After he and SCI employees observed what they considered to be further instances of confusion, in December 2019, Abersfeller registered Storage Concepts as a trade name in Nebraska and contacted Incontro Holdings and the owner of Closets Unlimited, Bob Lewis, requesting they change the name of their Omaha business to avoid consumer confusion. Filing 27-1 at 2-3, 33-36. On February 5, 2020, SCI's counsel sent Closet & Storage Concepts a letter demanding it stop

using its name due to consumer confusion with SCI. Filing 27-1 at 12. Incontro Holdings' counsel responded February 20, 2020, denying use of SCI's trade name and any likelihood of confusion while offering to post disclaimers as to any affiliation with SCI. Filing 27-1 at 13-14. After receiving no response from Closets Unlimited, SCI's counsel sent another letter in March, 2020, including notice from the Nebraska Secretary of State that the name "Closets and Storage Concepts, Inc." was unavailable in Nebraska because it conflicted with Storage Concepts. Filing 27-1 at 21-22. Counsel for the parties continued to discuss the matter until April 17, 2020, when SCI's counsel sent Defendants' counsel a letter rejecting another offer of a disclaimer and reiterating SCI's position that Defendants were infringing on its mark and trade name. Filing 27-1 at 30-31. SCI then filed the present action on October 26, 2020 and moved for the preliminary injunction at issue here on January 11, 2021. *See* Filing 1; Filing 25.

It is undisputed that SCI delayed filing the present action for approximately six months after discussions between the parties reached an impasse, *see* Filing 1 (Complaint filed October, 26, 2020), and it was two months more after that until SCI sought an injunction, *see* Filing 25 (present motion filed January 11, 2021). This delay corresponds with the height of the COVID-19 pandemic, which is one of the greatest crises our world has seen in recent history. It is also clear that soon after discovering Closet & Storage Concepts in Omaha and becoming convinced that confusion was occurring, SCI, through Abersfeller, contacted Closet & Storage Concepts to try and get Defendants to stop using the Storage Concepts name without resorting to litigation. Filing 27-1 at 1-3.

The record indicates SCI maintained its position that Closet & Storage Concepts was infringing on its mark and sought to remedy the matter through discussions between counsel, including formal cease and desist letters, which continued until reaching a final impasse in April

2020. Filing 27-1 at 12-31. Thus, Defendants had ample notice of SCI's consistently-held intention to challenge their use of the mark and had no reason to be lulled into thinking that SCI would abandon its position, making prejudice to them unlikely. *See Ty, Inc. v. Jones Group Inc.*, 237 F.3d 891, 903 (7th Cir. 2001) (upholding a ruling stating that delay without evidence of prejudice would not weaken claim of irreparable injury).

The Court also notes that both SCI and Defendants have each cited the adverse effects of the COVID-19 pandemic on their businesses as a potential reason the Court should rule in their favor. Filing 32 at 23 (noting the Incontros continued to invest in the business while dealing "with the challenges of COVID-19" during the delay); Filing 37 at 19 (noting "communications between the parties continued until April 2020, when the global COVID-19 pandemic had begun to severely impact the Country in an unprecedented manner").

Additionally, SCI continued gathering evidence in support of its motion for injunctive relief during the delay. *See, e.g.*, Filing 27-1 at 3-4 (Abersfeller noting information gleaned from Defendants' websites as late as January, 2021); *see also* Filing 27-1 at 33 (Rebecca Maltby noting a call she took in October 2020 as evidence of confusion). The Court also notes that the length of the delay alone is not dispositive and finds SCI's six-month delay in bringing suit and additional two months to seek an injunction was not so unreasonably long as to vitiate its arguments in favor of irreparable harm. *See Novus Franchising*, 725 F.3d at 894 (finding seventeen month delay rebuts inference of irreparable harm); *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 603 (8th Cir. 1999) (finding nine year delay in seeking relief undercuts claim); *Travel Tags, Inc. v. UV Color, Inc.*, 690 F.Supp.2d 785, 802 (D. Minn. 2010) (finding three year delay in filing suit was not justified); *CHS, Inc. v. PetroNet, LLC*, No. CIV. 10-94, 2010 WL 4721073, at *4 (D. Minn. Nov. 15, 2010) (finding eight month delay in seeking injunction after filing complaint

undermined claim); *Safety-Kleen Sys., Inc. v. Hennkens*, 301 F.3d 931, 936 (8th Cir. 2002) (finding seven month delay did not undermine claim where plaintiff was "marshal[ing] its case for a preliminary injunction"). Given the unique circumstances present here, particularly the clear notice provided to Defendants and the delay coinciding with the onset of an unprecedented pandemic, the Court finds SCI's delay in seeking injunctive relief is explainable and legally excusable. Thus, SCI has demonstrated likely irreparable harm.[1]

### B. Balance of Injury to the Parties

The Court must next consider the balance of the harm to SCI if no injunction is granted versus the injury that would befall Defendants if an injunction were granted. *See Dataphase*, 640 F.2d at 113 ("the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant"). Whether the injunction issues or not, the Court's decision will likely result in hardship for one of the parties. The Court's task is to balance the harms.

If the Court does not grant the injunction, SCI will be injured by ongoing likely consumer confusion, potentially resulting in lost business and goodwill, which would be difficult to quantify in a later determination of damages, as is the case in meritorious trademark infringement suits generally. *United Healthcare*, 316 F.3d at 741 (citing *General Mills*, 824 F.2d at 625 ("Loss of intangible assets such as reputation and goodwill can constitute irreparable injury.")). Evidence in the record supports SCI's assertion that confusion is already occurring and likely to continue. *See* Filing 27-1 at 1-4, 33-36 (Abersfeller and Rebecca and Matthew Maltby noting instances of confusion). On the other hand, Incontro Holdings has invested significantly in establishing its

---

[1] Defendants also briefly suggests a laches defense for consideration in assessing SCI's likelihood of success on the merits. Filing 32 at 20-21 ("The equitable defense of laches should be considered in evaluating the likelihood of success on the merits of a trademark infringement claim."). "Laches applies when a claimant inexcusably delays in asserting its claim and thereby unduly prejudices the party against whom the claim ultimately is asserted." *JDR Indus., Inc. v. McDowell*, 121 F.Supp.3d 872, 889 (D. Neb. 2015) (citing *Hubbard Feeds*, 182 F.3d at 602). Because the Court finds no prejudice to Defendants due to the clear and timely notice SCI provided of its allegation of infringement, the Court concludes Defendants are unlikely to prevail on a laches defense upon review of the evidence presented.

Closet & Storage Concepts franchise in Omaha; the Incontros themselves estimate spending in excess of one million dollars to build their business. Filing 33-4 at 4.

The Court does not doubt that there will be some financial hardship for the Incontros associated with rebranding their business, but nothing in the injunction sought would prevent Incontro Holdings from continuing to operate its business; it must merely stop operating under a mark owned by another entity. Given the presumed harm associated with infringing on another's mark, a likelihood of ongoing confusion, the confusion between the businesses already evident, and the fact that any injunction issued would not prohibit Incontro Holdings from continuing operations under a new name, the Court finds the balance of the harms weighs in favor of an injunction.

### C. Likelihood of Success on the Merits

SCI must demonstrate a likelihood of success on the merits of its claims to obtain an injunction. "In deciding whether to grant a preliminary injunction, likelihood of success on the merits is most significant." *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir. 2012) (internal quotation marks omitted) (quoting *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 83 (8th Cir. 1995)). A movant need not prove it is more likely than not to prevail, but "need only show a reasonable probability of success, that is, a 'fair chance of prevailing'" on the merits. *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013) (quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc)). Defendants argue SCI has not demonstrated likely success on the merits of its claims. Filing 32 at 18-40. The Court disagrees with Defendants. SCI demonstrates a likelihood of success on its claims for trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1125; misuse

of a trade name under Neb. Rev. Stat. § 87-216; and deceptive practices under the NUDTPA, Neb. Rev. Stat. § 87-303.

*1. Trademark Infringement and Unfair Competition under the Lanham Act*

Under the Lanham Act, a party is liable for damages they cause to another when it, "on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof . . . which is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities . . . ." 15 U.S.C. § 1125(a)(1)(A). To prevail on its Lanham Act claims, SCI must show it owned the Storage Concepts mark at issue and that Incontro Holdings used the mark in manner resulting in a likelihood of confusion. *See Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1009 (8th Cir. 2011) (citing *Davis v. Walt Disney Co.*, 430 F.3d 901, 903 (8th Cir. 2005)) ("Both [infringement and false designation] claims require a trademark owner to prove that it has ownership  . . . and that the defendant has used the mark . . . in a manner likely to cause consumer confusion as to the source or sponsorship of the goods or services.").

a. Ownership and Validity of SCI's Mark

"The exclusive right to use a trademark is established by prior appropriation and use of the mark in connection with a particular business." *Bass Buster, Inc. v. Gapen Mfg. Co., Inc.*, 420 F. Supp. 144, 157 (8th Cir. 1976) (citing *Wrist-Rocket Mfg. Co., Inc. v. Saunders Archery Co.*, 516 F.2d 846, 850 (8th Cir. 1975)). Thus, a plaintiff who appropriates and uses a particular mark in the conduct of a given type of business has superior rights to those of a defendant who later uses the mark in the same business, despite any registration. *Id.* ("Trademark rights are not acquired by federal or state registration of the marks, and the plaintiff has the burden of proving prior

appropriation and use."). The party using the mark first has trademark rights to it unless the claimed trademark is invalid on other grounds. *Id.*

The unrefuted evidence in the record is that SCI has used the name Storage Concepts since June 1981. Filing 27-1 at 1. SCI began offering "residential storage services" in the Omaha area under the name Storage Concepts in 1995. Filing 34 at 1. Closets Unlimited, who began selling storage solutions on the east coast in 1987, federally registered its trademark "Closet & Storage Concepts" in 2000, noting it first used the mark in 1998. Filing 33-1 at 2-3; Filing 33-2. Incontro Holdings became a franchisee of Closets Unlimited and opened its Closet & Storage Concepts franchise in Omaha in July 2019. Filing 33-1 at 6. Thus, there is no debate that SCI used the name Storage Concepts to sell closets and other residential storage options in the Omaha area long before Incontro Holdings or Closets Unlimited entered the Omaha market. Thus, if Storage Concepts is a valid mark entitled to protections, SCI has the superior claim to it in the Omaha market.

To qualify for trademark protections, a mark must be distinctive. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992). There are four categories of marks useful in classifying distinctiveness; marks can be (1) arbitrary or fanciful; (2) suggestive; (3) descriptive; or (4) generic. *Duluth News-Tribune v. Mesabi Pub. Co.*, 84 F.3d 1093, 1096 (8th Cir. 1996). "A suggestive mark is one that requires some measure of imagination to reach a conclusion regarding the nature of the product." *Id.* Like arbitrary or fanciful marks, marks that are suggestive are inherently distinctive and thus afforded broad trademark protections. *General Mills*, 824 F.2d at 625. Descriptive marks "designate[] characteristics, qualities, effects or other features of the product and can be protected only if shown to have become distinctive through acquiring secondary meaning." *Id.* Generic marks are not entitled to trademark protections. *Id.*

SCI argues Storage Concepts is suggestive, though even if it were descriptive, it would have acquired secondary meaning through SCI's many years using the mark in Omaha. Filing 26 at 12-13. Defendants contend that the mark is descriptive, and SCI has not established that it has taken on a secondary meaning. Filing 32 at 26-29. The Court agrees with SCI that Storage Concepts is suggestive.

Storage Concepts does not "designate[] characteristics, qualities, effects or other features" of the residential storage solutions the businesses here sell; the name alone gives no indication of what the product or service being sold is beyond that it concerns storage. As SCI points out, based on the mark alone, a consumer could just as easily think Storage Concepts was operating servers to store data as it was selling home storage solutions. *See* Filing 37 at 9. Further, that Closets Unlimited was able to obtain a trademark registration for Closet & Storage Concepts, which arguably leaves even less to the imagination than merely Storage Concepts, is an indication that the mark is distinctive, and thus suggestive rather than descriptive. Because the Court finds SCI first acquired and has continuously used the Storage Concepts mark in Nebraska, and the mark is sufficiently distinctive, SCI has superior rights to the mark's use in its storage business.

b. Likelihood of Confusion

The Court also agrees with SCI that there is a likelihood that consumers will confuse the two businesses at issue here. In assessing the likelihood of confusion for the purposes of injunctive relief, courts look to six nonexclusive factors:

> (1) the strength of the owner's mark; (2) the similarity of the owner's mark and the alleged infringer's mark; (3) the degree of competition between the products; (4) the alleged infringer's intent to "pass off" its goods as the trademark owner's; (5) incidents of actual confusion; and, (6) the type of product, its cost, and conditions of purchase.

*Everest Capital Ltd. V. Everest Funds Mgmt., L.L.C.*, 393 F.3d 755, 759-60 (8th Cir. 2004) (quoting *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 830 (8th Cir.1999)); *see also SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980).

### i. Strength of the Mark

"A strong and distinctive trademark is entitled to greater protection than a weak or commonplace one." *SquirtCo*, 628 F.2d at 1091. "A mark's '[s]trength consists of both conceptual strength and commercial strength.'" *Two Men and a Truck/International, Inc. v. Thomas*, 908 F. Supp. 2d 1029, 1037 (D. Neb. 2012) (quoting *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 393 (4th Cir. 2009)). Conceptual strength is determined by mark categorization, and suggestive marks are conceptually strong. *See Thomas*, 908 F. Supp. 2d at 1037 (citing *Frosty Treats Inc. v. Sony Computer Entm't Am. Inc.*, 426 F.3d 1001, 1005 (8th Cir. 2005) ("Suggestive marks ... are entitled to protection regardless of whether they have acquired secondary meaning.")). Commercial strength of a mark can be proved through a plaintiff's record of success using the mark and the length and exclusivity of the plaintiff's use of the mark. *Id.* at 1038 (citing *George & Co.*, 575 F.3d at 395).

The Court has already determined that the Storage Concepts mark is suggestive. Thus, the mark is conceptually strong. It is unrefuted that SCI has been operating in the Omaha area with the Storage Concepts mark since 1981 and has been continuously offering residential storage services under the mark since 1995. Filing 27-1 at 1; Filing 34 at 1. No party has offered evidence that SCI's use of Storage Concepts was not exclusive in the Omaha area prior to Incontro Holdings opening its Closet & Storage Concepts franchise. Thus, the Court finds SCI has a long history of exclusive and successful use of the mark in Omaha, demonstrating the mark's commercial strength.

*ii. Similarity of the Marks*

In assessing similarity of marks, a court "must evaluate the impression that each mark in its entirety is likely to have on a purchaser exercising the attention usually given by purchasers of such products." *Duluth News-Tribune*, 84 F.3d at 1097 (citing *General Mills*, 824 F.2d at 627). "The use of identical, even dominant, words in common does not automatically mean that two marks are similar." *General Mills*, 824 F.2d at 627 (citing *Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1183 (11th Cir. 1985)). Courts may consider "the marks' visual, aural, and definitional attributes and compare the trade dress of the products in determining whether the total effect conveyed by the two marks is confusingly similar." *Luigino's*, 170 F.3d at 830. However, "[a] realistic evaluation of consumer confusion must attempt to recreate the conditions in which buying decisions are made . . . ." *Calvin Klein*, 815 F.2d at 504.

Defendants argue their Closet & Storage Concepts mark is not similar, for trademark purposes, to the Storage Concepts mark despite the use of the phrase "storage concepts" in both names. Filing 32 at 31-32. Defendants rely heavily on differences in trade dress, contending their use of Closet & Storage Concepts' blue and black color scheme and clothing hanger logo sufficiently differentiate it from SCI's red and black color scheme, such that there could be no consumer confusion. Filing 32 at 31-32. SCI argues that the trade dress used by each business is of relatively little importance here because consumers in the closet and storage market are typically not going to compare branded products side-by-side before purchasing. Filing 37 at 13-15. The Court agrees with SCI.

In cases dealing with competing cereals, frozen entrees, or even newspapers, it makes sense to weigh differences in product packaging and branding heavily in assessing the likelihood of consumer confusion. *See General Mills*, 824 F.2d 622; *Luigino's*, 170 F.3d 827; *Duluth News-*

*Tribune*, 84 F.3d 1093. In such cases, consumers have the competing, branded products readily available for comparison. As SCI points out, consumers likely to do business with Closet & Storage Concepts or Storage Concepts would have little occasion or reason to examine visual differences in trade dress while making their purchase decisions. Filing 37 at 13-15. A difference in sign color or a logo in a show room gives consumers little basis for distinction when they are not presented with the other brand selling similar products side-by-side. Further, consumers in the market at issue are far more likely to rely on internet reviews and searches or other word-of-mouth. In such circumstances, the marks must be evaluated for similarity "on the basis of [the marks'] likely effect upon consumers who do not have [both marks] before them, but who may have a general, vague, or even hazy, impression or recollection of [the] marks such as may trigger a belief that a relation exists between [the businesses]." *Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434, 440 (7th Cir. 1990) (quotation omitted) (emphasis original). Thus, the similarity in the sound of the marks is far more important a consideration than any trade dress used by either company. The relevant similarity of the marks favors a finding of likely consumer confusion.

### iii. Competitive Proximity

The parties and the Court agree that Closet & Storage Concepts and Storage Concepts sell similar products and compete for the same customers in the Omaha area. *See* Filing 26 at 16; Filing 32 at 33. Thus, there is no question that the degree of competition between the two businesses is high and increases the likelihood of confusion.

### iv. Intent to Confuse

SCI notes it has "yet to conduct discovery to obtain evidence" indicating whether Defendants' intended to benefit from its goodwill in opening a Closet & Storage Concepts franchise in Omaha. Filing 26 at 16. SCI argues that Incontro Holdings' choice to open a Closet &

Storage Concepts franchise when Closets Unlimited also had More Space Place franchises available is "at least some evidence" that Incontro Holdings sought to benefit from appropriating SCI's mark. Filing 26 at 16. While this may be "some" evidence, it is not enough to conclude that Incontro Holdings possessed ill intent. Further, Defendants have set forth a plausible and innocent motivation for choosing the Closet & Storage Concepts franchise over the More Space Place option. Filing 32 at 33-34 (noting the differing business models of the respective franchises). Thus, while the Court finds it difficult to believe that neither the defendant franchisor nor franchisee was aware SCI was operating a nearly identical business a mere three miles from where they intended to open their franchise, with a nearly identical sounding name, the Court cannot find that Defendants' intent favors finding a likelihood of confusion based on the evidence presented.

### v. Incidents of Actual Confusion

"Actual confusion is not essential to a finding of trademark infringement, although it is positive proof of likelihood of confusion." *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980) (citing *Standard Oil Co. v. Standard Oil Co.*, 252 F.2d 65, 74 (10th Cir. 1958)); *but see Woodsmith Publ'g Co. v. Meredith Corp.*, 904 F.2d 1244, 1249 (8th Cir. 1990) ("Though evidence of actual confusion may be the best evidence of likelihood of confusion, it is not conclusive of its existence."). "In analyzing this factor, weight is given to 'the number and extent of instances of actual confusion.'" *Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 768 (8th Cir. 2010) (quoting *Duluth News-Tribune*, 84 F.3d at 1098).

SCI offers six examples it says demonstrate people confusing the two businesses at issue. Filing 26 at 3-4. Three examples involve telephone calls Rebecca Maltby, an SCI employee, fielded while working at SCI. In one call, during October 2020, Rebecca spoke with a customer asking for "Closets and Storage Concepts" and inquiring about getting a broken closet door fixed.

Filing 27-1 at 33. Despite Rebecca telling the customer she had reached Storage Concepts, the customer continued to try and arrange repairs. Filing 27-1 at 33. In summer of 2019, Rebecca answered a call from a woman who "mentioned a job interview with [SCI]." Filing 27-1 at 34. Rebecca informed her SCI was not hiring, and when the caller insisted she had submitted an application with "Storage Concepts and Closets," Rebecca suggested the caller might be trying to reach Closet and Storage Concepts, which ended their conversation. Filing 27-1 at 34. In fall of 2019, Rebecca took a call from a delivery driver who was outside SCI's loading dock waiting to deliver a shelving unit. Filing 27-1 at 34. She told the driver SCI had not ordered the unit, and after checking with his dispatcher, he left. Filing 27-1 at 34. Other incidents of confusion offered by SCI include SCI employee Matt Maltby being congratulated by an acquaintance on SCI's new building after the acquaintance saw an "article or advertisement" that the acquaintance mistakenly thought was discussing SCI; an SCI customer and employee of the Better Business Bureau ("BBB") telling SCI owner Ed Abersfeller she had been confused when Closet & Storage Concepts applied for BBB accreditation because she knew SCI was already accredited; and a customer asking Abersfeller when SCI had moved to John Galt Boulevard after driving past Closet & Storage Concepts. Filing 27-1 at 2, 36.

Defendants cite *Duluth News-Tribune*, suggesting SCI's purported evidence of confusion is equivalent to "the vague evidence of misdirected phone calls and mail" which the court rejected as "hearsay of a particularly unreliable nature given the lack of an opportunity for cross-examination of the caller or sender," finding such evidence was insufficient to create a material question of fact at the summary judgment stage. 84 F.3d at 1098. The Court finds the evidence here is distinguishable.

As an initial matter, this case is not at the summary judgment stage, and in considering a motion for a preliminary injunction, the Court has discretion to consider evidence that might be inadmissible at trial. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (citations omitted) ("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing . . . ."); *see also Mullins v. City of New York*, 626 F.3d 47, 52 (2nd Cir. 2010) ("[H]earsay evidence may be considered by a district court in determining whether to grant a preliminary injunction . . . goes to weight, not preclusion, at the preliminary injunction stage."); *Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993) (stating that a "district court may rely on otherwise inadmissible evidence, including hearsay" in deciding a motion for preliminary injunction). Further, the calls Rebecca Maltby answered were not offered for the truth of any assertion made by either the callers or Rebecca; they are therefore not hearsay. *See* Fed. R. Evid. 801(c)(2) (defining hearsay as a statement "a party offers in evidence to prove the truth of the matter asserted in the statement."). Additionally, though the callers are not named and likely could not be located for cross-examination at a trial, Rebecca's description of the calls is hardly vague. Unlike the rejected calls in *Duluth News-Tribune*, the calls Rebecca answered indicate the callers had no idea two similarly named businesses existed. *See Duluth News-Tribune*, 84 F.3d at 1098 (noting question to newspaper employee about "which" News-Tribune demonstrated distinction rather than confusion). Therefore, Rebecca's calls are stronger evidence of confusion.

Similarly, SCI did not offer the congratulatory statement of Matt Maltby's acquaintance regarding SCI's "new location" for its truth; it was offered to demonstrate the acquaintance's confusion. SCI offered a customer's question to Abersfeller about its John Gault Boulevard

location for the same purpose. The BBB employee and SCI customer Abersfeller spoke with was relaying the contents of her conversation with another BBB employee to Abersfeller, so the truth of her out of court statements to Abersfeller is at issue, raising a hearsay concern. *See* Filing 27-1 at 2 (noting that the BBB employee was telling Abersfeller what she said to her co-worker). However, the Court has little concern as to the reliability of statements at issue in this context. Unlike an unidentified and misdirected caller, this customer and BBB employee can likely be identified and called to testify to her own confusion at a later stage in this litigation, if needed. The Court finds that SCI has set forth some evidence of actual confusion, indicating consumer confusion is likely.

### vi. Type of Product, Cost, and Conditions of Purchase

The final factor in assessing the likelihood of confusion requires the Court to "examine[] the conditions of purchase and the degree of care expected of customers." *Sensient Techs.*, 613 F.3d at 769 (citing *Frosty Treats*, 426 F.3d at 1008). "In considering this factor, [the Court] must stand 'in the shoes of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods.'" *Luigino's*, 170 F.3d at 831 (internal quotation marks omitted) (quoting *General Mills*, 824 F.2d at 627).

Defendants have offered evidence that they work with customers often over a course of weeks and multiple visits when providing their services. Filing 33-4 at 5-6. They further note that the projects they undertake cost consumers more than $3,000 on average. Filing 33-1 at 4; Filing 33-4 at 6. SCI does not refute this evidence. Given the collaborative nature of a consumer's purchase decisions in the storage market, the extended decision timeline, and the significant cost associated with the products at issue, consumers in this market are likely more careful and attentive

than one might expect of those buying less substantial goods or services on a shorter timeline. Thus, consumers in this market are less likely to confuse similarly named storage businesses when they are aware both exist. However, there is less evidence that consumers in this market would be aware Storage Concepts and Closet & Storage Concepts are two separate businesses in the same area. Despite what are likely relatively careful consumers, the lack of ready in-person comparison between branding leaves open the chance of confusion. Because the consumers at issue are likely to be more careful, on the whole, this factor weighs against finding a likelihood of confusion, but it is hardly dispositive.

The strength of SCI's mark, the similarity of the marks at issue, and the competitive proximity of the businesses weigh heavily in favor of finding a likelihood of confusion. SCI also submitted some evidence of actual confusion. Thus, four of six recognized factors weigh significantly in favor of a likelihood of confusion. Defendants' assumed lack of intent to confuse and the typical conditions of a purchase in the market weigh against SCI, though each of these two factors provides relatively weak support for Defendants' contention that confusion is unlikely. Therefore, the Court finds SCI has shown a likelihood of confusion between its mark and Defendants' mark in Omaha. SCI has a fair chance of prevailing on its Lanham Act claims.

### 2. Nebraska State Law Claims

In addition to its Lanham Act claims, SCI asserts it is entitled to a preliminary injunction because Incontro Holdings' use of the Closet & Storage Concepts mark in Nebraska constitutes misuse of SCI's Storage Concepts trade name under Neb. Rev. Stat. § 87-216(1) and a deceptive trade practice under Neb. Rev. Stat. § 87-302 (2)-(3). Filing 26 at 17-19. The parties again dispute whether Storage Concepts is entitled to protection, and whether the marks at issue are similar enough in the present circumstances to produce a likelihood of confusion. *See* Filing 26 at 17-19

(SCI reiterating arguments that the marks are entitled to protection and similar and that confusion is likely); Filing 32 at 38-40 (Defendants again arguing the marks are not similar and are unlikely to cause confusion). The Court agrees with SCI that it is also likely to prevail on its state-law claims.

Under Nebraska law, any person that uses "in connection with his or her business, without the consent of the registrant, any reproduction, counterfeit, copy, or colorable imitation of a trade name registered under sections 87-208 to 87-219.01 in a manner likely to cause confusion, mistake, or deception of purchasers," is liable to the registrant of the trade name. Neb. Rev. Stat. § 87-216(1). To show trade name infringement, a plaintiff must prove "the existence of (1) a valid trade name entitled to protection, and (2) a substantial similarity between the plaintiff's and the defendant's names, which would result in either actual or probable deception or confusion by ordinary persons dealing with ordinary caution." *Nebraska Irr., Inc. v. Koch*, 523 N.W.2d 676, 679 (Neb. 1994) (citing *Dahms v. Jacobs*, 272 N.W.2d 43 (Neb. 1978); *Ransdell v. Sixth Street Food Store*, 120 N.W.2d 290 (Neb. 1963)). A party engages in a deceptive trade practice in Nebraska when, in the course of its business, it "[c]auses likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services" or "as to affiliation, connection, or association with, or certification by, another." Neb. Rev. Stat. § 87-302(a)(2)-(3). Nebraska courts consider similar factors to those considered by federal courts in assessing the likelihood of confusion. *See Koch*, 523 N.W.2d at 680 (citing *Dahms*, 272 N.W.2d at 44).[2]

---

[2] Factors considered by Nebraska courts include: (1) Degree of similarity in the products offered for sale; (2) geographic separation of the two enterprises and the extent to which their trade areas overlap; (3) extent to which the stores are in actual competition; (4) duration of use without actual confusion; and (5) the actual similarity, visually and phonetically, between the two trade names.

It is undisputed that SCI registered the trade name Storage Concepts with Nebraska's Secretary of State in December 2019. *See* Filing 34 at 4 (application for registration); Filing 27-1 at 32 (Secretary of State letter stating the name Closets and Storage Concepts, Inc. is not available for use in Nebraska because it conflicts with Storage Concepts and Storage Concepts, Inc.). As discussed above, the Court finds that Storage Concepts is suggestive, and thus it is valid and entitled to protection.[3] Further, factors used to assess the likelihood of confusion, whether federal or state, weigh significantly in favor of finding consumer confusion it likely. Thus, SCI is likely to prevail on its state-law claims as well as its federal claims.

### D. Public Interest

Finally, the public interest weighs in favor of an injunction. As Defendants point out, "[i]n the context of trademark infringement, [the public interest] factor involves balancing of the interest in protecting the public from confusion or deception with the interest in a competitive market." Filing 32 at 44 (quoting *Aveda Corp. v. Evita Marketing, Inc.*, 706 F.Supp. 1419, 1431-32 (D. Minn. 1989)). Here, an injunction serves both the interest in avoiding confusion and in maintaining healthy market competition. Enjoining Defendants from using a business name that subsumes the name of its direct competitor, Storage Concepts, would have the obvious benefit of avoiding any likely consumer confusion. Further, the injunction would apply only to the trademark used by Incontro Holdings; Incontro Holdings remains free to continue competing in the cabinetry storage marketspace, though under a different name, to the public's benefit. Thus, the public interest favors an injunction here.

---

[3] The Court also notes the Nebraska Secretary of State registered the trade name Storage Concepts pursuant to Nebraska law, including Neb. Rev. Stat. § 87-209, which prohibits registration of a name that is merely descriptive or likely to cause confusion with another registered name. *See* Filing 34 at 4; Filing 27-1 at 32. While not dispositive, the Nebraska Secretary of State's decision to register the mark has evidentiary value that the Court can consider. *See Dahms*, 272 N.W.2d at 45 ("The issuance of the permit by the Secretary of State is a ministerial act and we do not need to recognize his finding of fact, but we do note that he deals frequently in similar matters and for that reason take his opinion for its evidentiary value.").

### E. Bond

Under Federal Rule of Civil Procedure 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." SCI argues that the circumstances of the present case warrant waiving the security requirement or setting bond at a nominal amount. Filing 26 at 22-23. Defendants argue the Incontros have invested over one million dollars in their Closet & Storage Concepts franchise, an injunction would put them out of business, and thus at least a one-million-dollar bond should be required. Filing 32 at 47-48. Filing 33-4 at 5 ("Rebranding would likely force us out of business . . . .").[4] The Court fails to see how the total investment the Incontros have made in their franchise amounts to the costs and damages they would sustain if wrongfully enjoined, however.

A district court is allowed "much discretion in setting bond," but it must make findings to support its determination that the bond it requires is adequate considering the costs and damages that would result from a wrongfully issued injunction. *Hill v. Xyquad, Inc.*, 939 F.2d 627, 632 (8th Cir. 1991) (citing *Rathmann Group v. Tanenbaum*, 889 F.2d 787, 789 (8th Cir.1989)). "Courts in this circuit have almost always required a bond before issuing a preliminary injunction, but exceptions have been made where the defendant has not objected to the failure to require a bond or where the damages resulting from a wrongful issuance of an injunction have not been shown." *Richland/Wilkin Joint Powers Auth. v. U. S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016) (citations omitted). Exceptions have also been made to ensure private enforcement of federal

---

[4] During the April 27, 2021 hearing on this matter, SCI objected to the portion of Ken Incontro's affidavit in which he states an injunction would put Incontro Holdings out of business, arguing a lack of foundation. This objection is overruled. SCI may disagree with Incontro's assessment of his situation, but as one of the two proprietors of his business with familiarity with its finances, Incontro has the relevant information to make the assessment he makes.

statutes vindicating public interests. *Id.* (allowing a waiver of bond for an injunction granted under the National Environmental Policy Act). Elsewhere, courts have also not required bond where plaintiffs have demonstrated a high likelihood of success on the merits. *See TracFone Wireless, Inc. v. Washington*, 978 F.Supp.2d 1225, 1235 (M.D. Fla. 2013) (forgoing bond where plaintiff demonstrated "a high probability of succeeding on the merits of its Lanham Act claims, and because Defendants have no legitimate interest in the continued use of [Plaintiff's] Trademarks"); *see also California ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325-26 (9th Cir. 1985) (noting that a likelihood of success on the merits "tips in favor of minimal or no bond" and stating the court has discretion to dispense with bond when requiring it "would effectively deny access to judicial review").

Here, while the public has an interest in fair competition, the interest primarily at issue is SCI's right to the exclusive use of its mark in its market for commercial gain. Thus, the case for a public-interest exception to the bond requirement is not strong. It is also obvious that Closet & Storage Concepts' Omaha franchise will suffer some costs associated with rebranding and some damages associated with lost good will and advertising expenses if the Court's grant of an injunction later proves improper. However, the one million dollars in costs the Incontros have put in to "starting and running the business" include franchise and startup fees, leasing business space, buying equipment, supporting staff, and attending training in addition to marketing expenses. Filing 33-4 at 4 (Ken Incontro's Affidavit). The Court is not ordering the business to liquidate; instead, Closet & Storage Concepts may simply operate under a different name. While there would undoubtedly be costs associated with such a change, Defendants have given the Court little evidence from which it could determine what those costs could be, and it is clearly not the case that such costs would approach the entirety of the funds spent to start and operate the business.

Further, it is not lost on this Court that Defendant—with ill intent or not—voluntarily started a business in Omaha, Nebraska called "Closet & Storage Concepts" even though an entity now providing the same services has been operating as "Storage Concepts" in Omaha since 1981. SCI should not be burdened with what could be a prohibitively high bond of one million dollars in order to defend the name the owners spent a career building.

SCI has demonstrated a high likelihood of success on its claims. In this case, it would be especially inequitable to require a bond that might cause SCI to forgo its right to the exclusive use of its mark, effectively denying SCI's right to enforce its mark. Because Defendants failed to produce sufficient evidence to support their request for a one-million-dollar bond, and the lack of evidence supporting any specific lower amount, the Court is left with assessing the evidence in the record to determine a fair bond under the law.

The evidence illustrates that Plaintiffs will have to at a minimum rebrand the front of their store and other physical items upon the issuance of this Court's ruling. Although Defendants have failed to provide precise information as to the cost of physical rebranding or potentially other expenses associated with being enjoined from using the name "Closet & Storage Concepts" in Nebraska, the Court will impose a minimal bond of $5,000.00 based upon the information available to it in the record.

## III. CONCLUSION

For the reasons stated above, the Court concludes SCI's Motion for a Preliminary Injunction, Filing 25, should be granted.

IT IS ORDERED:

1. Defendants are enjoined from using the Closet & Storage Concepts mark or any other name, trademark, or service mark that incorporates or is confusingly similar to Plaintiff's Storage Concepts mark in the Omaha metropolitan area;

2. Defendants are enjoined from making any representations which are suggestive that Defendants have some association, approval, or authorization from Plaintiff to use the Storage Concepts mark;

3. This preliminary injunction shall continue until final resolution of this case or until modified by the Court; and

4. Pursuant to Rule 65(c) and the provisions of this Order, the Court requires Plaintiff to post a bond with the Clerk of the Court in the amount of $5,000.00.

Dated this 5th day of May, 2021.

BY THE COURT:

_____
Brian C. Buescher
United States District Judge
